ORIGINAL

Approved: _____
ANDREW C. ADAMS/ ANDREW M. THOMAS/ JONATHAN REBOLD
Assistant United States Attorneys

Before:   THE HONORABLE DEBRA FREEMAN
          United States Magistrate Judge
          Southern District of New York

*[Stamp: U.S. FILED COURT FEB 14 2018 S.D. OF N.Y. OS]*

18 MAG 1220

- - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA            :   **SEALED COMPLAINT**
                                    :
          - v. -                    :   Violation of
                                    :   18 U.S.C. § 1349
KYRYLO SAMOILENKO,                  :
                                    :   COUNTY OF OFFENSE:
               Defendant.           :   NEW YORK
                                    :

- - - - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

RANDY FARRENCE, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), and charges as follows:

**COUNT ONE**

1. From at least in or about August 2017, up to an including on or about February 13, 2018, in the Southern District of New York and elsewhere, KYRYLO SAMOILENKO, the defendant, and others known and unknown, intentionally and knowingly did combine, conspire, confederate, and agree together and with each other to commit bank fraud in violation of Title 18, United States Code, Section 1344, to wit, SAMOILENKO participated in a scheme to cash checks drawn on unfunded bank accounts, opened in the name of sham companies created by SAMOILENKO and others, at multiple check-cashing businesses located across the country.

2. It was a part and an object of the conspiracy that KYRYLO SAMOILENKO, the defendant, and others known and unknown, would and did execute and attempt to execute a scheme and artifice to defraud financial institutions, the deposits of which were then insured by the Federal Deposit Insurance Corporation, and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody

and control of, such financial institutions, by means of false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1344.

(Title 18, United States Code, Section 1349.)

3. The bases for my knowledge and the foregoing charge are, in part, as follows: I am a Special Agent with FBI and have been personally involved in the investigation of this matter. This Affidavit is based upon my personal participation in the investigation, my examination of reports and records, and my conversations with other law enforcement agents and other individuals. Because this Affidavit is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

4. Since in or about August 2017, the FBI has been investigating a coordinated fraud directed against check cashing businesses in cities around the country, including New York City (the "Check Scam"). The Check Scam involves numerous individuals presenting what appear to be company payroll checks to multiple check-cashing businesses in the same city at approximately the same time, obtaining proceeds from the victim-businesses before they detect that the account on which the checks were to be drawn has insufficient funds, and then re-locating to another city to commit the fraud again. The Check Scam appears to have caused hundreds of thousands of dollars in losses in the last year alone.

5. Information regarding the Check Scam derives, in part, from the proactive work of a cooperating witness ("CW-1") who has pleaded guilty to federal crimes in an unrelated case and who has worked to assist the Government in hopes of receiving leniency at sentencing. Based on conversations with CW-1, a review of recordings created by CW-1, visual surveillance, and a review of records maintained by various check cashing businesses, I have learned, in part, the following:

a. In or about August 2017, CW-1 responded to an online job advertisement offering pay of $5,000 to $7,000. CW-1 spoke to "Sergey" and arranged a meeting. CW-1 then met "Sergey" — later identified as KYRYLO SAMOILENKO, the defendant — in

2

Brooklyn, New York. During that meeting, which was not recorded and occurred prior to the involvement of law enforcement, SAMOILENKO informed CW-1, in substance and in part, that SAMOILENKO leads one of three "crews" of individuals who travel together to various states for the purpose of cashing checks. SAMOILENKO explained that the group would obtain identification cards in the destination state, and would travel, eat, and lodge together. SAMOILENKO represented that the work was legal.

b. On or about August 17, 2017, CW-1, acting at the direction of law enforcement, spoke to SAMOILENKO to agree to join SAMOILENKO's check cashing "team." The conversation was audio recorded. During that conversation, in substance and in part, SAMOILENKO told CW-1 that SAMOILENKO would travel from Florida to Brooklyn to pick up CW-1, and would drive CW-1 from Brooklyn to Virginia (i.e., through the Southern District of New York) to obtain a Virginia state identification card. After CW-1 received the identification card, SAMOILENKO said, he was to join SAMOILENKO's crew cashing checks.

c. On or about August 27, 2017, SAMOILENKO and another member of SAMOILENKO's check cashing team ("CC-1") picked up CW-1 in Brooklyn, New York and drove him to Virginia, crossing through the Southern District of New York as they did so. Prior to the meeting, the FBI provided CW-1 with a recording device, and conversations between SAMOILENKO, CC-1, and CW-1 were therefore recorded. During the period of the recording, which continued until the following day, SAMOILENKO, in substance and in part, informed CW-1 that the crew worked by presenting one payroll check per week to each of approximately forty different check cashing stores. SAMOILENKO would drive the crew around to the various check cashing locations. The checks were printed so as to appear to be drawn on the account of a company SAMOILENKO had established in Virginia and that was publicly searchable on the internet; if a check cashing employee called the public number of the company as it appeared on the check, another co-conspirator ("CC-2") would answer the phone and purport to verify the company's existence.

d. On or about August 28, 2017, SAMOILENKO and CC-1 drove CW-1 to a UPS store in Alexandria, Virginia. Once there, SAMOILENKO texted CW-1's personal information to another co-conspirator ("CC-3"). A few minutes later, the UPS store received an email containing a lease agreement and utility bill in CW-1's name purporting to show that CW-1 resided in Alexandria (at the street address of the UPS store). CW-1, at SAMOILENKO's direction, took the documents to a Department of

3

Motor Vehicles office in Lorton, Virginia, where CW-1, at again at SAMOILENKO's direction, applied for a Virginia state identification card using the fictitious lease and utility bill.

  e. On or about September 12, 2017, CW-1 met SAMOILENKO. During that meeting, SAMOILENKO abandoned his original pretense that this Check Scam was legal and explained the Check Scam more fully to CW-1. SAMOILENKO told CW-1, in substance and in part, that the Check Scam was broken up into multiple roles: check cashers earned 25% of the total amount of cash they were able to withdraw from victim check cashing businesses; dispatchers receive 20% of the total amount of cash made by all check cashers in the crew; the crew boss gets 25% of total; and a boss in charge of multiple crews gets 30% of the total amount of cash made by each crew.

  f. On or about September 13, 2017, CW-1, at SAMOILENKO's direction, cashed approximately $10,000 to $11,000 worth of checks across approximately nine check cashing locations in Virginia. At the end of that day, SAMOILENKO took all of the cash obtained by CW-1 and deposited that cash into a bank account using an ATM on the street. Later, SAMOILENKO informed CW-1, in substance and in part, that the group planned to conduct the check cashing operation in Virginia for another two weeks before they made "the profit," meaning that the Check Scam's coordinated and large-scale overdraft would occur after approximately two weeks of smaller and non-suspicious withdrawals on the sham bank account.[1]  SAMOILENKO further stated, in substance, that the crew would next focus the Check Scam on check cashing locations in the Chicago area.

  g. On or about September 20, 2017, SAMOILENKO, CC-1, and CW-1 met in a hotel room in Virginia to split up the cash that, according to SAMOILENKO, represented the profits of the Check Scam as conducted in Virginia over the previous two weeks. During the meeting, CW-1 received $7,000, which represented a rounded share of the total checks that CW-1 cashed, less expenses incurred by SAMOILENKO. SAMOILENKO, in substance and in part, informed CW-1 that (i) the check cashing businesses suffered losses on the basis of the Check Scam and (ii) SAMOILENKO has paid a stranger to incorporate the company used

---

[1] The sham bank account used by SAMOILENKO in connection with this activity in Virginia was opened at a particular nationwide bank ("Bank-1"), which, from my review of publicly available information provided by the Federal Deposit Insurance Corporation ("FDIC"), I know to be FDIC insured.

4

on the payroll checks to avoid associating that company with the crew.[2]

      h. SAMOILENKO's crew then moved their operations to Chicago. Between on or about September 25, 2017 and September 28, 2017, CW-1, at SAMOILENKO's direction, participated in the Check Scam by, among other things, (i) obtaining an Illinois state identification document using a fake lease agreement and fake utility bill provided by SAMOILENKO, (ii) traveling with SAMOILENKO to dozens of check cashing businesses, first, on the south side of Chicago, Illinois and, later, on the north side, to engage check cashing store representatives in conversation about each business's practices regard cashing payroll checks, and (iii) discussing the operational plan with SAMOILENKO, which included using CC-1, among others, to cash checks at various victim businesses with CW-1.[3]

      6.    From my conversations with local law enforcement officials in Philadelphia, Pennsylvania, I have learned, among other things, that on or about February 13, 2018, KYRYLO SAMOILENKO, the defendant, was arrested in Philadelphia while waiting in a car outside of a check cashing location, at which time SAMOILENKO was in possession of a large number of purported payroll checks.

---

[2] Based on records provided by the various banks defrauded in the course of SAMOILENKO's offense, and based on my conversations with other law enforcement agents involved in this investigation, I have learned, among other things, that the banks on which the Check Scam's checks are drawn also incur a portion of the loss associated with the Check Scam.

[3] The sham bank account used by SAMOILENKO in connection with this activity in Chicago was opened at a particular nationwide ("Bank-2"), which, from my review of publicly available information provided by the FDIC, I know to be FDIC insured. Bank-2 is headquartered in the Southern District of New York.

WHEREFORE, deponent requests that a warrant be issued for the arrest of KYRYLO SAMOILENKO, the defendant, and that he be arrested and imprisoned, or bailed, as the case may be.

RANDY TARRENCE
Special Agent, FBI

Sworn to before me this
14th day of February, 2018

HONORABLE DEBRA FREEMAN
United States Magistrate Judge
Southern District of New York

6